IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                    No. CR 07-697 MCA

ALFRED R. TAFOYA,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the following motions:  (1) *Defendant's Motion to Suppress* [Doc. 13] filed on June 12, 2007, and amended [Doc. 17] on June 13, 2007; (2) *Defendant's Motion to Suppress Statements and Evidence Derived Therefrom* [Doc. 14] filed on June 12, 2007; (3) *Defendant's Motion for Impeachment and Exculpatory Evidence Pursuant to Giglio v. United States* [Doc. 15] filed on June 12, 2007; and (4) *Defendant's Motion for Additional Discovery Pursuant to Brady v. Maryland* [Doc. 16] filed on June 12, 2007.  The Court held a hearing on the above motions in Albuquerque, New Mexico, on August 20, 2007.  [Doc. 36.]  Having fully considered the parties' submissions, the applicable law, the evidence and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court denies *Defendant's Motion to Suppress* [Doc. 13, 17], but grants in part and denies in part *Defendant's Motion to Suppress Statements and Evidence Derived Therefrom* [Doc. 14] based upon the findings of fact and conclusions of

law set forth below.  The Court also grants in part and denies in part Defendant's discovery motions.

## I.    FINDINGS OF FACT

1.      On the evening of January 14, 2007, Defendant Alfred R. Tafoya and Susan Lopez were working as fugitive recovery agents[1] tasked with locating Darlene Eller, who was the subject of a bond forfeiture and wanted on a warrant for her failure to appear in court on a charge of driving while intoxicated (DWI).

2.      Defendant and Ms. Lopez had received information that Ms. Eller was in a residence at 17 Fermin Chavez Road in Valencia County, New Mexico, and that she was expected to self-surrender to the agents that evening.

3.      Before proceeding to the 17 Fermin Chavez Road address, Defendant and/or Ms. Lopez contacted the Valencia County Sheriff's Department (VCSD) and advised them of the situation; the VCSD elected not to intervene or send deputies to accompany Defendant and Ms. Lopez to the residence.  [Ex. A.]

4.      Initially, the occupants of the 17 Fermin Chavez Road address permitted Ms. Lopez to enter the residence when she arrived on the evening of January 14, 2007; Defendant remained outside and in back of the residence at that time.

---

[1]The Court uses the term "fugitive recovery agent" in lieu of the pejorative term "bounty hunter" because, as explained in the recorded portion of Defendant's interview introduced as Exhibit A, he typically works for a flat monthly fee rather than collecting a percentage of the bond amount for each fugitive recovered.

5.      Shortly after Ms. Lopez entered the residence, she was violently attacked by some of the occupants, and she used her radio to summon Defendant to assist her.

6.      Defendant came to the aid of Ms. Lopez, whereupon he also was violently attacked by some of the occupants of the residence.

7.      In response to one or more 911 calls,[2] Deputies from the Valencia County Sheriff's Department (VCSD) went to the 17 Fermin Chavez Road residence to restore order; they did not, however, retrieve Ms. Eller from the property, and the occupants continued to verbally threaten Defendant and Ms. Lopez as they left the scene.

8.      Defendant and other fugitive recovery agents returned to the 17 Fermin Chavez Road address after midnight on January 15, 2007, and on that occasion they took Ms. Eller into custody after another violent struggle in which VCSD deputies were again summoned to the scene.

9.      As a result of the incidents described above, the VCSD commenced an investigation of Defendant Alfred R. Tafoya, the results of which were later reported to Special Agent Kent Masters of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).

10.      Relying on the information supplied to him by the VCSD, Agent Masters prepared a search warrant affidavit on February 9, 2007, in which he alleged, among other

---

[2]The Government represented at the suppression hearing that recordings of the 911 calls were not preserved as evidence; Defendant's counsel is attempting to obtain a  recording from a private source, "OnStar,"but had not yet done so at the time of the suppression hearing.

things, that Defendant has a prior felony conviction and admitted possessing a shotgun during the January 14 incident at 17 Fermin Chavez Road.  [Ex. 1.]

11.    Based on the facts alleged in his affidavit, Agent Masters sought a search warrant for a house located at 7205 Cardiff Ave. NE, in Albuquerque, New Mexico, at which Defendant and his spouse reportedly resided according to telephone book listings and motor vehicle records.

12.    On February 9, 2007, the Honorable Robert Hayes Scott, United States Magistrate Judge, issued a search warrant based on Agent Masters' application, allowing ATF agents to search the 7205 Cardiff Ave. residence for firearms, ammunition, and related items on or before February 19, 2007.  [Ex. 1.]

13.    Agent Masters and other federal agents executed the search warrant on the morning of February 13, 2007, during which they found, among other things, the Mossberg shotgun and shotgun ammunition identified in the *Indictment* [Doc. 2] filed in this matter on April 10, 2007, as well as a sales receipt relating to this shotgun.  [Ex. 2 to Doc. 26-2.]

14.    Following the *Indictment*, Defendant filed motions to suppress certain evidence and statements, and the Court held a hearing on these motions on August 20, 2007.  [Doc. 13, 14, 17, 36.]

15.    Based on the testimony and other evidence presented at the hearing and in the motion papers, Defendant has made a credible showing that Agent Master's search warrant affidavit contains false and misleading information.

-4-

16.     Specifically, the affidavit falsely suggests that Defendant possessed a handgun or pistol on two occasions:  first, during the January 14 incident and second, when Defendant returned to 17 Fermin Chavez Road with additional fugitive recovery agents in the early hours of January 15.

17.     Without the allegation that Defendant possessed a pistol or handgun, the references to the January 15 incident, when Defendant returned to the residence with additional fugitive recovery agents, appears to lack any relevance to the firearms offense at issue in this case.

18.     To support the allegation that Defendant possessed a pistol or handgun (rather than a tazer or stun gun) during the January 14 incident and again during the January 15 incident, the search warrant affidavit relies solely on a statement attributed to Deputy Jim Martinez during an interview on February 6, 2006 [Ex. 1]; however, Deputy Jim Martinez did not testify at the suppression hearing, nor does the record contain any police report he might have prepared with respect to this issue, nor has the Government produced any information as to this individual pursuant to Giglio v. United States, 405 U.S. 150 (1972).

19.     Moreover, the CAD report or summary introduced at the suppression hearing does not reliably indicate that Deputy Jim Martinez was present during the January 14 incident.  [Ex. F.]

20.     Defendant presented credible evidence at the suppression hearing that he only possessed a "tazer" or "stun gun"--not a handgun or pistol–during the two incidents referenced above, and that it was his stepson and fugitive recovery partner, Sean Lewis, who

possessed the handgun or pistol during the January 15 incident referenced in the search warrant affidavit.

21.     This evidence is consistent with witness statements and the recorded interview of Defendant that were included with the parties' motion papers and/or the exhibits presented at the suppression hearing, which also indicate that Defendant possessed a "tazer" or "stun gun" rather than a firearm during the two incidents at 17 Fermin Chavez Road.  [Ex. A; Ex. 1 to Doc. 25-2.]

22.     The information regarding Defendant's possession of a tazer or stun gun was already known to Agent Masters and the sheriff's deputies from the police reports and recorded statements that were available to them before the search warrant affidavit was prepared.

23.     The search warrant affidavit also is misleading insofar as it suggests that certain information was obtained from Defendant knowingly and voluntarily rather than through false promises or misrepresentations that he did not need a lawyer and would not be prosecuted.

24.     Defendant credibly testified at the hearing that a representative of the VCSD (most likely Detective Donald Donges) contacted him by telephone a few days after the January 15 incident at 17 Fermin Chavez Road and directed him to provide a statement.

25.     During that telephone call, Defendant asked the VCSD representative if Defendant would be looked at as a subject or was being charged, and whether he should bring his attorney or have his attorney turn in a statement for him.

26.     At the suppression hearing, Defendant credibly testified that the VCSD representative responded to these questions by telling Defendant that he was not being looked at as a subject and that he was not being charged with anything.

27.     These assurances misled Defendant into believing that he was in the position of a crime victim or fellow officer reporting on alleged crimes committed by other individuals, rather than a suspect or target responding to a police investigation of his own actions.[3]

28.     Considering the circumstances of the January 14 incident, including the injuries sustained by himself and the other fugitive recovery agent, Ms. Lopez, as well as the threats they received, Defendant's belief that the VCSD personnel were treating him as a crime victim or fellow officer, rather than a suspect, was reasonable.

29.     At the suppression hearing on August 20, 2007, Detective Donges denied making the above telephone call and claimed that his first contact with Defendant did not occur until he met and interviewed Defendant on January 29, 2007.

30.     In response to a leading question from the prosecutor during direct examination at the suppression hearing, Detective Donges denied ever telling Defendant that he was not considering any charges and that Defendant did not need a lawyer.

---

[3]Defendant also testified at the suppression hearing that, at some point, he got the impression Detective Donges was looking at his fugitive recovery team as criminal suspects rather than crime victims; however, I understand this testimony to be referring to a later stage of the investigation, after Detective Donges or other VCSD personnel had already induced Defendant to make his initial statements to them.

31.     In light of his cross examination and the material produced at the suppression hearing under Giglio,[4] I do not find Detective Donges' testimony to be credible for the purpose of meeting the Government's burden of proving that Defendant's statements to Detective Donges and Deputy St. Onge were knowing and voluntary.

32.     I also do not find Detective Donges' version of events to be plausible because it fails to adequately explain what would have prompted Defendant to provide a statement and appear at the VCSD station for an interview on or about January 29, 2007.

33.     On or about Friday, January 26, 2007, a document purporting to be a hard copy of an e-mail from Defendant was received at the VCSD station; however, Defendant did not personally deliver this document.

34.     Pursuant to the instructions and representations he had previously received from Detective Donges or another VCSD representative, Defendant appeared for an interview at the VCSD station on or about January 29, 2007.

35.     The interview at the VCSD station was conducted by Detective Donges and Deputy St. Onge.

36.     Detective Donges and Deputy St. Onge did not place Defendant under arrest or take him into custody before or during the interview on January 29, 2007.

37.     During the interview, Detective Donges had Defendant sign the e-mail document that the VCSD had previously received from another individual.

---

[4]The Giglio material is the subject of a separate order that is filed under seal.  [Doc. 34.]

38.     Defendant's signature on this document was not preceded or accompanied by any oral or written advice of his rights pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and its progeny.

39.     Neither Detective Donges nor Deputy St. Onge advised Defendant of his <u>Miranda</u> rights before or during the interview on January 29, 2007, or on any other occasion.

40.     Any advice or representations that Detective Donges or Deputy St. Onge may have given to Defendant before conducting the interview on January 29, 2007, are not contained on the portion of that interview that was recorded and introduced into evidence at the suppression hearing on August 20, 2007.  [Ex. A.]

41.     The portion of the interview during which Defendant purportedly discussed his prior felony conviction and produced his business license and a firearms sales receipt also does not appear on the recording introduced at the suppression hearing.  [Ex. A.]

42.     Except for the portion of the interview that was recorded and introduced into evidence at the suppression hearing [Ex. A], I find that the testimony of Detective Donges and Deputy St. Onge is not credible for purposes of establishing the content and circumstances of that interview or any advice that preceded it.

43.     Under the totality of the circumstances, Defendant's statements to Detective Donges and other VCSD personnel (such as Deputy St. Onge) after the January 14 incident were not knowingly or voluntarily made because they were deceptively induced by a false or misleading promise that Defendant was not being looked at as a subject and that he was not being charged with anything.

44.     Nevertheless, even if the Court disregards the false and misleading information about the pistol and the content of Defendant's interview with Detective Donges and Deputy St. Onge, Agent Masters' search warrant affidavit still makes reference to other sources on which to base a finding of probable cause that Defendant momentarily possessed and discharged a round of ammunition from a shotgun during the January 14 incident.

45.     In addition, the search warrant affidavit contains information from independent sources (such as public telephone listings and motor vehicle records) which support the inference that there was probable cause to believe that Defendant and the shotgun would be found at the 7205 Cardiff Ave. address on or about February 13, 2007.

46.     Thus, Defendant has not met his burden of showing that, after the challenged portions of the search-warrant affidavit are stricken, the remaining content of the affidavit is not sufficient to support a finding of probable cause.

47.     The search warrant was not stale at the time of its execution on the morning of February 13, 2007.

48.     On that date, Agent Masters and a team of other ATF agents waited until Defendant's spouse voluntarily opened and exited the garage door on the front of the residence (as she left for work) before announcing their presence and entering the residence through the garage.

49.     The agents did not knock and announce their presence at the formal main entry door of the 7205 Cardiff Ave. residence, which is located on the side of the house.

-10-

50.     To the extent that the agents violated the knock-and-announce rule or used excessive force in executing the search warrant, such violations are not causally related to the discovery of evidence in the residence and do not provide a basis for invoking the exclusionary rule or the "fruit of the poisonous tree" doctrine.

51.     During the execution of the search warrant, the agents found the firearm sales receipt for the shotgun, as well as the shotgun itself and various forms of ammunition.  [Ex. 2 to Doc. 26-2.]

52.     The business license for Defendant's fugitive recovery business is a public document that the agents could obtain and authenticate without the use of Defendant's statements.

53.     Thus, the business license, as well as the firearm sales receipt and unsigned written statement, inevitably would have been discovered from independent sources, and the documents obtained from such independent sources are not the product of Defendant's unknowing and involuntary communications with Detective Donges or Deputy St. Onge.

## II.     LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A.     The Search Warrant Affidavit

The first category of evidence which the Defendant seeks to suppress consists of the shotgun, ammunition, and related items seized from the 7205 Cardiff Ave. residence on February 13, 2007.  Insofar as they were premised on a search warrant issued by a United States Magistrate Judge, the search and seizure of this category of evidence is presumed to

be reasonable under the Fourth Amendment, and it is Defendant's burden to prove otherwise. See United States v. Carhee, 27 F.3d 1493, 1496 & n.3 (10th Cir. 1994).

A defendant may meet his burden of proof in this context if he can show that the search warrant's finding of probable cause depends on false or misleading information that the affiant has supplied with the knowledge that it is false or with reckless disregard for the truth. See United States v. Artez, 389 F.3d 1106, 1116 (10th Cir. 2004). When, as here, the affiant is largely relying on information supplied to him by other law enforcement officers (i.e., the VCSD personnel), it is appropriate for "the district court to hold the government accountable for statements made not only by the affiant but also for statements made by other government employees which were deliberately or recklessly false or misleading." United States v. Kennedy, 131 F.3d 1371, 1376 (10th Cir. 1997).

A defendant may request an evidentiary hearing to test the veracity of a search warrant affidavit under the procedural framework articulated in Franks v. Delaware, 438 U.S. 154, 171-72 (1978). Under this framework, an evidentiary hearing is not required unless the defendant alleges deliberate falsehood or reckless disregard for the truth on the part of the affiant, and those allegations are accompanied by a sufficient offer of proof. See Artez, 389 F.3d at 1116. "Allegations of negligence or innocent mistake" are insufficient to warrant an evidentiary hearing under Franks. See id.

To support an allegation regarding the affiant's deliberate falsehood or reckless disregard for the truth, a defendant should provide affidavits of witnesses or satisfactorily explain their absence. Such affidavits or explanations should include a statement of

-12-

supporting reasons, not merely conclusory denials.  In addition, a defendant seeking an evidentiary hearing must show that, after the challenged portions of the affidavit are stricken, the remaining content of the affidavit is not sufficient to support a finding of probable cause. See id.; Franks, 438 U.S. at 171.

Based on the evidence presented with Defendant's motion papers and at the suppression hearing, I find that Defendant has met his burden of proving a deliberate falsehood or reckless disregard for the truth on the part of the VCSD personnel who reported that Defendant  possessed a handgun or pistol during the January 14 incident or during the subsequent incident in the early hours of January 15.  Both Defendant and his stepson, Sean Lewis, credibly testified at the hearing that this report was untrue.  Mr. Lewis also provided an affidavit to this effect.  [Doc. 17-3.]

During the recorded interview introduced as Exhibit A at the suppression hearing, Defendant also clarified that, aside from the shotgun that he possessed for a brief period during the January 14 incident, he only had a tazer--not a handgun or pistol.  Defendant further clarified during the recorded interview that his tazer was the "sidearm" referenced in the written statement attributed to him.  [Ex. A, Ex. 2.]  In addition, there are statements from other witnesses (Dayna Curliss, Dalton Kittrick) reported in the document attached as Exhibit 1 to the Government's response brief which indicate that Defendant possessed a "tazer" or "stun gun" rather than a firearm.  [Ex. 1 to Doc. 25-2.]

All of this information was available to the VCSD personnel and to Agent Masters at the time he prepared his search warrant affidavit.  As noted above, the Court must hold the

Government accountable for deliberately or recklessly false or misleading statements by both the affiant and the VCSD personnel under the rule articulated in Kennedy, 131 F.3d at 1376.

Deputy Jim Martinez of the VCSD was the only witness identified in the search warrant affidavit who is alleged to have observed or made statements about Defendant possessing a handgun or pistol, but the Government did not call this individual to testify at the suppression hearing or introduce any Giglio material concerning this individual in response to Defendant's discovery requests.  Further, the search warrant affidavit fails to mention the content of the statements taken from other witnesses who contradicted Deputy Jim Martinez on this point, including Defendant's own statements during the recorded interview that is referenced in the search warrant affidavit.  [Ex. A.]  Finally, the presence of Deputy Jim Martinez at the scene is not documented on the CAD report or summary introduced as Ex. F, which Detective Donges described as the product of an unreliable recordkeeping system.

On this record, I find that the information in the search warrant affidavit was deliberately or recklessly skewed so as to create a false or misleading impression that Defendant possessed more than one firearm on more than one occasion, and that he was the aggressor that sparked the violence on those occasions.  Once the references to Defendant's possession of a pistol or handgun are deleted, the January 15 incident when Defendant returned to the 17 Fermin Chavez Road address with other fugitive recovery agents has little

or no relevance to whether he earlier possessed the shotgun and only serves to cast him in a negative light.[5]

I further find that the information in the search warrant affidavit which was supplied by Detective Don Donges is false or misleading insofar as it suggests that Defendant's statements in the presence of Detective Donges or Deputy St. Onge were knowing and voluntary. The basis for this second finding is articulated in greater detail in a later section of this *Memorandum Opinion and Order*.

These findings do not end the Court's inquiry into the validity of the search warrant, however, because Defendant also must show that, after the challenged portions of the affidavit are stricken, the remaining content of the affidavit is not sufficient to support a finding of probable cause. See <u>Artez</u>, 389 F.3d at 1116; <u>Franks</u>, 438 U.S. at 171. Defendant has not made a sufficient showing on this second component of the <u>Franks</u> test for the following reasons.

First, even if all references to Defendant's communications with Detective Donges and Deputy St. Onge, as well as all references to Defendant's possession of a handgun or pistol, are stricken from the affidavit, there remains the statement attributed to Sergeant Simon Martinez alleging that Defendant told him he possessed a shotgun and discharged a round of ammunition from it during the January 14 incident. There also remains the fact of Defendant's prior felony conviction, which is a matter of record that Agent Masters or the

---

[5]While the Federal Rules of Evidence do not apply in the context of an application for a search warrant or a suppression hearing, the Court will entertain a motion in limine to exclude evidence of the January 15 incident at trial if Defendant so requests.

VCSD could confirm through independent sources.  Taken in combination, these facts are sufficient to establish probable cause that Defendant committed a crime when he possessed the shotgun during the January 14 incident.

Courts have held that the term "probable cause" is not self-defining, but requires an inquiry based upon common sense informed by the totality of the circumstances found in the particular case.  See United States v. Mathis, 357 F.3d 1200, 1205 (10th Cir. 2004) (citing Illinois v. Gates, 462 U.S. 213 (1983)).  In determining whether probable cause exists to support a search warrant, a judge's task

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Artez, 389 F.3d at 1111 (quoting Gates, 462 U.S. at 238).

A judge's decision to issue a warrant is entitled to "great deference" by a reviewing court.  Gates, 462 U.S. at 236.  Accordingly, a reviewing court "need only ask whether, under the totality of the circumstances presented in the affidavit, the [issuing] judge had a 'substantial basis' for determining that probable cause existed."  Artez, 389 F.3d at 1111 (quoting Gates, 462 U.S. at 238-39).  In this regard, the probable-cause standard does "'not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'"  United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990) (quoting Adams v. Williams, 407 U.S. 143, 148-49 (1972)).  Thus, in this context the Government is not required to conclusively rebut Defendant's claims of necessity, self-

defense, or defense of another in order to establish probable cause to believe that Defendant committed a crime on January 14, 2007.

Nevertheless, probable cause to believe that Defendant committed a crime on January 14, 2007, must be distinguished from probable cause to believe that *evidence* of that crime would be found at the 7205 Cardiff Ave. address almost a month later on February 13, 2007. Recognizing this distinction, Defendant asserts that the search warrant affidavit was stale at the time of its execution and lacks a sufficient nexus between the location of the alleged crime and the site of the search.  In other words, Defendant challenges whether there was probable cause to believe the shotgun and ammunition he allegedly possessed at the time of the January 14 incident would be found at the 7205 Cardiff Ave. address on February 13, 2007, when the search warrant was executed.

It is true that a search warrant affidavit can be facially deficient if it fails to specify enough information to establish probable cause that evidence of a crime will be found at the site of the search.  See, e.g., United States v. Gonzales, 399 F.3d 1225, 1231 (10th Cir. 2005) (rejecting a warrant for the search of a residence that was issued two days after the automobile accident described in the affidavit, where the affidavit failed to specify who owned the vehicle in question or what connected the residence to the suspect or the vehicle). But Agent Masters' affidavit in this case does not suffer from the same obvious defects as the search warrant affidavit at issue in Gonzales, 399 F.3d at 1231.

The search warrant need not rely on information that Defendant provided to Detective Donges or Deputy St. Onge in order to support the inferences that Defendant resided at, and

conducted business from, the 7205 Cardiff Ave. address, and that the shotgun and other evidence was likely to be found there.  Agent Masters could draw these inferences from other government or public records such as motor-vehicle registrations, business licenses, and telephone listings, in combination with the information previously gleaned from Sergeant Simon Martinez on the date of the incident, *e.g.*, that Defendant was working as a fugitive recovery agent and that the shotgun was not seized by the VCSD at that time.

The case law also does not support Defendant's contention that the search warrant was stale at the time of its execution.

> Initially, it should be noted that the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit. Together with the element of time we must consider the nature of the unlawful activity. Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant.

United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972).  In addition to the passage of time, the question of staleness " depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized."   Mathis, 357 F.3d at 1207.

In support of his staleness argument, Defendant points to the absence of any evidence in the record to indicate that he was engaged in any criminal activity or in possession of any firearms from the date of his prior conviction in 1990 until the January 14 incident at the 17 Fermin Chavez Road address.  The more relevant question, however, is whether there was probable cause to believe that the shotgun Defendant allegedly possessed on January 14

would be found at his residence and place of business approximately one month *after* that date.

Here the property to be seized was not something that is destroyed or consumed during the course of its normal use (such as drugs), nor was it something that one would expect to be quickly passed on to another owner (such as stolen merchandise). Rather, we are dealing with a shotgun that was used or possessed in the course of an ongoing fugitive-recovery business where it is reasonable to infer that firearms are part of the "tools of the trade." Under these circumstances, it was reasonable for the Magistrate Judge to infer that the nature and length of the suspected criminal activity (being a felon in possession of a firearm) was of an ongoing and continuous nature.

Viewing the relevant factors under the "totality of the circumstances" approach articulated in Gates, 462 U.S. at 233, while discounting the information that was proven to be false or misleading, the remaining portions of the search warrant affidavit on their face provided the Magistrate Judge with a substantial basis for finding probable cause to support the issuance of a search warrant for the 7205 Cardiff Ave. address on February 13, 2007. In light of this conclusion, it is unnecessary to address the Government's alternative contention that the agents who executed the search warrant could rely on the "good faith" exception to the Fourth Amendment's warrant requirement articulated in United States v. Leon, 468 U.S. 897 (1984).[6]

---

[6]Application of the "good faith" exception would be especially problematic here in light of the Court's findings that the search warrant was premised in part on the deliberate or reckless inclusion of false or misleading information by the VCSD.

### B.     The Execution of the Search Warrant

Defendant also challenges the execution of the search warrant on the grounds that the agents violated the "knock and announce" rule when they entered the residence.  As a factual matter, I agree with Defendant that the agents' entry in this case was not preceded by a knock or an announcement at the formal main entry door of the 7205 Cardiff Ave. NE address, which is located on the side of the house.  Rather, the agents waited until Defendant's spouse opened and exited the garage door on the front of the house before announcing their presence and gaining entry through the garage.

It does not necessarily follow that the agents' entry violated the Fourth Amendment or that the fruits of the search must be suppressed.  The Supreme Court has recently clarified that the "knock and announce" rule does not always require officers to literally go to the formal main entry door of a residence, knock on it, and await a response before entering.  See Brigham City v. Stuart, 126 S. Ct. 1943, 1949 (2006).  Depending on the circumstances, officers may announce their presence by other means that are equivalent to a knock, such as opening a screen door leading to a kitchen and yelling in "police."  See id.  And "once the announcement was made, the officers were free to enter."  Id.

Applying the reasoning of Stuart to the facts of this case, I conclude that the "knock and announce" rule did not require the agents to ignore the presence of Defendant's spouse or the open garage door on the front of the house and instead knock on the main entry door on the side of the house.  Approaching Defendant's spouse through the driveway and open garage door provided a functionally equivalent means of announcing their presence.

-20-

To the extent that the agents were too hasty in charging through the door between the interior of the garage and the rest of the residence, the exclusionary rule does not provide the proper remedy for such haste.  In its second recent decision interpreting the "knock and announce" rule, the Supreme Court concluded that a violation of this rule does not necessarily provide grounds for excluding any evidence.  See Hudson v. Michigan, 126 S. Ct. 2159, 2165 (2006).  As emphasized in Justice Kennedy's concurring opinion, one of the problems with trying to use  a "knock and announce" violation as a basis for invoking the exclusionary rule is the absence of the causal link between the violation and the discovery of evidence that is normally required to invoke the "fruit of the poisonous tree" doctrine.  See id. at 2170-71 (opinion of Kennedy, J., concurring in part and concurring in the judgment).  "Under our precedents the causal link between a violation of the knock-and-announce requirement and a later search is too attenuated to allow suppression," because "the failure to wait at the door cannot properly be described as having caused the discovery of evidence."  Id.

That said, the Court remains troubled by the level of force used to execute the search warrant, especially given the level of communication and cooperation that Defendant apparently exhibited in his prior dealings with the law enforcement personnel investigating the January 14 incident, and the apparent lack of any evidence of criminal activity prior to that date.  Nevertheless, precedent compels the conclusion that this issue does not provide a basis for excluding the evidence seized from the 7205 Cardiff Ave. address in this criminal matter.

### C.     Defendant's Statements to Detective Donges and Deputy St. Onge

In addition to the motion challenging the search warrant and its execution, Defendant has filed a separate motion to suppress the statements he made or adopted in the presence of Detective Donges and/or Deputy St. Onge.  In support of this motion, Defendant invokes the "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence:  the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."  Dickerson v. United States, 530 U.S. 428, 433 (2000).  The Fifth Amendment inquiry applies to "the admissibility in evidence of any statement given during custodial interrogation of a suspect" and depends on whether the police provided the suspect with the four warnings required under Miranda v. Arizona, 384 U.S. 436 (1966).  Dickerson, 530 U.S. at 435.  In these situations the Government generally bears the burden of proving that a defendant's waiver of his or her Miranda rights is knowing and voluntary.  See United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997).

Under the Fifth Amendment, "[i]t is well established that police officers are not required to administer Miranda warnings to everyone whom they question."  United States v. Erving L., 147 F.3d 1240, 1246 (10th Cir.1998) (quotation omitted).  The general rule is that full Miranda warnings need to be given only when an individual is subject to "custodial interrogation," Miranda, 384 U.S. at 439, and a person is not "in custody" for Miranda purposes unless his "freedom of action is curtailed to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quotation omitted); accord United States v. Rogers, 391 F.3d 1165, 1169 (10th Cir. 2004).  Further, "'the initial determination of

custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" <u>Rogers</u>, 391 F.3d at 1171 (quoting <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994)).

Under the totality of the circumstances, I determine that Defendant was never "in custody," for the purpose of triggering <u>Miranda</u> requirements, during his contacts with Detective Donges and/or Deputy St. Onge at the VCSD station.  While I do not find the testimony of Detective Donges or Deputy St. Onge to be credible with respect to the content of their communications with Defendant (except as noted on the recorded portion of the interview introduced as Exhibit A to the suppression hearing), the objective circumstances of the encounter nevertheless indicate that Defendant came to the police station unaccompanied by law enforcement officers, attended an interview in a closed office with Detective Donges and Deputy St. Onge, and then left the station in his own vehicle after the interview without being arrested or booked.

These circumstances cannot be equated with a formal arrest or even a forcible investigative detention.  The Supreme Court and the Tenth Circuit have specifically rejected the proposition that the mere presence of uniformed officers carrying holstered weapons is coercive *per se*.  <u>See</u> <u>United States v. Drayton</u>, 536 U.S. 194, 204-05 (2002); <u>United States v. Abdenbi</u>, 361 F.3d 1282, 1288 (10th Cir. 2004).  And because Defendant was never in custody during his communications with Detective Donges and/or Deputy St. Onge, I conclude that the absence of <u>Miranda</u> warnings–in and of itself--does not provide a basis for suppressing any of those communications.

-23-

The absence of <u>Miranda</u> warnings is nevertheless relevant to determining whether Defendant's statements were knowing and voluntary under a due-process standard.  <u>See</u> <u>United States v. Toles</u>, 297 F.3d 959, 965-66 (10th Cir. 2002).  Apart from <u>Miranda</u> and its progeny, the admissibility of a statement obtained from a suspect by a police officer may still be challenged on due-process grounds.  <u>See</u> <u>Dickerson</u>, 530 U.S. at 434.  I understand Defendant to be asserting such a due-process challenge here when he stated in his motion papers and at the suppression that his communications with Detective Donges and Deputy St. Onge were compelled or involuntary.

The due-process inquiry "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession."  <u>Id.</u> (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)).  "Whether voluntary consent was given is a question of fact, determined by the totality of the circumstances and reviewed for clear error."  <u>United States v. Zubia-Melendez</u>, 263 F.3d 1155, 1162 (10th Cir. 2001).  To meet its burden of proving that Defendant's consent was voluntary, the Government must present clear and positive testimony that consent was unequivocal and specific and freely given without implied or express duress or coercion.  <u>See</u> <u>id.</u>  "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."  <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548-49 (1968); <u>accord</u> <u>United States v. Leary</u>, 846 F.2d 592, 598 (10th Cir. 1988).

Factors that may be indicative of involuntariness include: "physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and

the physical and mental condition and capacity of the defendant." United States v. McCurdy,
40 F.3d 1111, 1119 (10th Cir. 1994).  While there is no evidence of physical mistreatment
or excessive force on the part of Detective Donges or Deputy St. Onge in this instance,
Defendant does allege some form of promise, inducement, deception, or trickery, *i.e.*, that
his statements were induced by a false or illusory promise that no charges would be filed
against him if he complied with the demands of Detective Donges and/or Deputy St. Onge.

Under both traditional due-process analysis and more recent authorities following
Miranda, incriminating statements may be inadmissible if they were obtained as a direct
result of an express *quid pro quo* bargain in which the statements are exchanged for false or
illusory promises that particular charges will be dropped or that the punishment will be
reduced to a certain degree.  See generally   2 Wayne R. LaFave  *et al.*, Criminal Procedure
§ 6.2(c), 6.9(c) at 453, 587 (2d ed. 1999); see, e.g., Clanton v. Cooper, 129 F.3d 1147, 1158-
59 (10th Cir. 1997).  Incriminating statements obtained in this manner must be suppressed
because they result from the deceptive inducement rather than from an act of free will by the
declarant.  See Griffin v. Strong, 983 F.2d 1540, 1543 (10th Cir. 1993).  In addition, a false
promise that a person will not be prosecuted or will receive a lesser punishment in exchange
for making an incriminating statement tends to contradict and undermine the efficacy of
Miranda warnings.  See  United States v. Roman-Zarate, 115 F.3d 778, 781 (10th Cir. 1997);
(citing United States v. Rutledge, 900 F.2d 1127, 1131 (7th Cir. 1990)).

Express *quid pro quo* bargains resulting from such deceptive inducements must be
distinguished, however, from situations where a law enforcement officer simply makes a

generalized prediction that a suspect's cooperation might be helpful to him and offers to make such cooperation known to the attorney(s) responsible for deciding the nature and extent of any criminal prosecution.  Such generalized predictions and offers to convey a person's cooperation in a favorable light to the prosecuting attorney do not necessarily render a confession or a waiver of <u>Miranda</u> rights involuntary.  <u>See</u>  <u>United States v. Nguyen</u>, 155 F.3d 1219, 1223 (10th Cir. 1998); <u>Roman-Zarate</u>, 115 F.3d at 781; <u>United States v. Dillon</u>, 150 F.3d 754, 758 (7th Cir. 1998); 2 Wayne R. LaFave, *et al.*, *supra* § 6.2(c), at 453 n.91. Similarly, efforts to persuade a person to cooperate by befriending him, expressing sympathy with his plight, or encouraging him to tell the truth generally do not render a confession involuntary.  <u>See</u> <u>Amaya-Ruiz v. Stewart</u>, 121 F.3d 486, 494 (9th Cir. 1997);  <u>United States v. Rojas-Martinez</u>, 968 F.2d 415, 418 (5th Cir. 1992); 2 Wayne R. LaFave, *et al*., *supra* § 6.2(c), at 459-60.  "The confession was not coerced merely because the police did not inform Defendant of all the potential charges that could be brought against him."  <u>Nguyen</u>, 155 F.3d at 1222.  "That a defendant balanced personal considerations with the possible cost of disclosure does not render his subsequent statements involuntary."  <u>Roman-Zarate</u>, 115 F.3d at 783.

In this case, I find that Defendant's communications with Detective Donges and Deputy St. Onge were induced by false promises or misrepresentations that Defendant would be treated as a crime victim or fellow officer and that he would not be charged with a crime if he cooperated with them.  These false promises or misrepresentations go beyond mere generalized predictions or friendly cajoling and are more appropriately categorized as an

express *quid pro quo* bargain which has the effect of destroying the voluntariness of any statements made or adopted by the Defendant in response to the deceptive inducement.

In making this determination, it is also important to examine whether, in light of Defendant's age, intelligence, and education, it was reasonable for him to believe or rely upon the false or illusory promises that he would not be charged and did not need a lawyer. Defendant's occupation as a fugitive recovery agent, as well as his prior conviction, indicate that he has "previous experience with the criminal justice system," and there is no indication that his age, intelligence, or education make him "'unusually susceptible to coercion.'" Toles, 297 F.3d at 965 (quoting Nguyen, 155 F.3d at 966).   Defendant's prior experience in this regard may support a reasonable inference that he had some knowledge of arrest procedures and Miranda warnings.

On the other hand, it is also reasonable to infer from Defendant's basic knowledge of such procedures that he would have inquired of Detective Donges or other VCSD personnel about these procedures before appearing for an interview without an attorney.  And the fact that Defendant had some familiarity with law enforcement techniques does not necessarily preclude him from forming a reasonable belief that his statements would not be used against him in a criminal prosecution, especially when he was told so before the interview.  There are circumstances in which law-enforcement officers legitimately may be required to provide statements for investigational purposes in exchange for a promise that such statements will not be used against them in a criminal prosecution.  See generally Garrity v. New Jersey, 385

U.S. 493 (1967); In re Grand Jury Subpoenas, 40 F.3d 1096, 1101-1102 (10th Cir. 1994) (collecting cases).

The rationale behind such *quid pro quo* bargains is that an officer should not be faced with a "'Hobson's choice' of incriminating himself or suffering a penalty." In re Grand Jury Subpoenas, 40 F.3d at 1101. Crime victims may face a similar choice when they risk incriminating themselves in order to report a crime, particularly where the alleged perpetrators of that crime will pose an ongoing threat to the victim if the crime goes unreported or the victim does not cooperate with the authorities.

The circumstances of the January 14 incident, in which Defendant and another fugitive recovery agent were brutally attacked and threatened by several occupants of the residence at 17 Fermin Chavez Road, provided Defendant with strong grounds for believing that the VCSD was viewing him as a crime victim or fellow officer whose cooperation was needed to investigate and prosecute these attackers, or at least prevent them from carrying out their threats to shoot or kill Defendant or Ms. Lopez in the future. In this regard, I note Defendant's recorded statement that he or his fugitive recovery partner, Ms. Lopez, notified the VCSD of their intent to locate Ms. Eller at the 17 Fermin Chavez Road address and requested the VCSD's assistance in taking Ms. Eller into custody *before* they went to that address on January 14, 2007. [Ex. A.] Their decision to visit the residence despite the apparent unavailability of VCSD backup was prompted by their expectation that Ms. Eller was going to surrender voluntarily. The vicious attack on Ms. Lopez when she entered the residence came as a complete surprise to Defendant, and he had no reason to believe that he

or Ms. Lopez would be viewed as the aggressors when the VCSD came to investigate the January 14 incident.  This situation is not one in which it would have been obvious from the beginning that Defendant was the target of the VCSD's investigation.

On these facts, I conclude that it was reasonable for Defendant to believe and rely upon the VCSD's representations that he would not be charged and was not being viewed as a suspect or target in that agency's investigation.  It follows that the Government has not met its burden of proving that Defendant's communications with Detective Donges and Deputy St. Onge were voluntarily made or adopted, and all evidence of those communications must be suppressed pursuant to the exclusionary rule.  The Government may not introduce or refer to these statements at trial during its case-in-chief or for purposes of impeaching the Defendant if he chooses to testify.  See Portash, 440 U.S. at 458-59.

D.    **The Firearm Sales Receipt, Business License, and Written Statement**

The next question is whether the due-process violation that occurred in Defendant's communications with Detective Donges and Deputy St. Onge also warrants the suppression of any of the documents that were referenced or produced during those communications. The Supreme Court recently held that even if a criminal defendant can show that a particular statement was taken in violation of his Miranda rights, the "fruit of the poisonous tree" doctrine does not apply to non-testimonial evidence obtained as a result of that statement. See United States v. Patane, 542 U.S. 630, 634 (2004).   It is by no means clear, however, that the same rationale would limit the reach of the exclusionary rule with respect to non-testimonial evidence obtained as a result of "actual violations of the Due Process Clause,"

id. at 642, because even the Patane plurality opinion acknowledges that "the Court requires the exclusion of the physical fruit of actually coerced statements," id. at 644.  See also id. at 639 (citing New Jersey v. Portash, 440 U.S. 450, 458-59 (1979)).

Our Supreme Court also has recognized that the act of producing documents involuntarily (as in responding to a subpoena) may have "communicative aspects of its own, wholly aside from the contents of the papers produced," insofar as "[c]ompliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the" person against whom the subpoena is directed.  Fisher v. United States, 425 U.S. 391, 410 (1976).  Under certain circumstances, that person's compelled production of the documents would indicate his or her "belief that the papers are those described in the subpoena."  Id.

More recently, the Supreme Court  restated that "the testimonial aspect of a response to a subpoena duces tecum does nothing more than establish the existence, authenticity, and custody of items that are produced."  United States v. Hubbell,  530 U.S. 27, 40-41 (2000). In that case, the Court concluded that the evidence at issue had to be suppressed because the Government made "derivative use" of the testimonial aspects of former Whitewater executive and attorney Webster Hubbell's response to a subpoena.  See id. at 41.  The Court characterized the Government's subpoena as "the quintessential fishing expedition," id. at 33, and emphasized that:  "Given the breadth of the description of the 11 categories of documents called for by the subpoena, the collection and production of the materials demanded was tantamount to answering a series of interrogatories asking a witness to

disclose the existence and location of particular documents fitting certain broad descriptions."  Id. at 41.

Under the authorities cited above, it is arguable that Defendant's act of producing the firearm sales receipt and business license, as well as his act of adopting and signing the written statement that the VCSD had previously received, were part and parcel of the testimonial disclosures that were taken in violation of his due-process rights.  Such acts of production must be distinguished from the factual scenario in Patane, 542 U.S. at 635, where the taking of the defendant's statement technically violated Miranda but was not an actual violation of the Due Process Clause, and where the defendant's statement simply provided the information that led police officers to their own discovery and seizure of non-testimonial evidence (namely a Glock pistol).

Nevertheless, I conclude that it is unnecessary to attempt to reconcile Patane with the "act of production" doctrine and the Supreme Court's due-process jurisprudence in this instance, because even if Defendant's acts of producing, signing, or adopting the documents at issue in this case are suppressed as fruits of the due-process violation, the Government has met its burden of proving that these documents inevitably would have been discovered from independent sources.  "The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation."  Nix v. Williams, 467 U.S. 431, 443 (1984).

Closely related to the "independent source" doctrine is the "inevitable discovery" doctrine.  "When . . . the evidence in question would inevitably have been discovered without

reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." Id. at 448. These two doctrines share a common rationale, namely that:

> 'the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred.... When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.'

Murray v. United States, 487 U.S. 533, 537 (1988) (quoting Nix, 467 U.S. at 443).

The "act of production" doctrine allows for a similar exception to the exclusionary rule, because the Supreme Court has recognized that there are circumstances in which the communicative or testimonial aspects of producing documents are not significant enough to invoke this rule. In Fisher, for example, the Court concluded that the "existence and location of the papers [sought in the subpoena] are a foregone conclusion," and the person asserting the Fifth Amendment privilege "adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers." Id. at 411. Thus, the "act of production" doctrine does not apply where the Government has shown "with reasonable particularity that it had prior knowledge of the existence and location of . . . the subpoenaed documents." United States v. Ponds, 454 F.3d 313, 327 (D.C. Cir. 2006). "Whether an act of production is sufficiently testimonial to implicate the Fifth Amendment, therefore, depends on the government's knowledge regarding the documents before they are produced." Id. at 320.

-32-

In this case, the VCSD already knew and possessed the written statement purporting to be from Defendant's email address, because a third party had delivered it to the station before Defendant's arrival.  See Fisher, 425 U.S. at 397 (concluding that the Fifth Amendment privilege does not apply to production of documents by third parties). Assuming the Government is prepared to authenticate this written statement through other sources without relying on Defendant's act of adopting and signing it during his communications with Detective Donges and Deputy St. Onge, the involuntariness of such communications does not provide a basis for suppressing the unsigned version of the written statement itself.

I reach the same conclusion with respect to the firearm sales receipt that Defendant mentioned and produced during his communications with Detective Donges and Detective St. Onge.  The inventory of items seized during the execution of the search warrant at the 7205 Cardiff Ave. address indicates that the same firearm sales receipt was later found in the residence during that search.  [Ex. 2 to Doc. 26-2.]  And, as noted above, Agent Masters' search warrant affidavit established probable cause for the search of the 7205 Cardiff Ave. address even if  Defendant's communications with Detective Donges and Deputy St. Onge had been excluded from consideration at the time the search warrant was issued.  Thus, the execution of the search warrant provides an independent source from which the Government may produce the firearm sales receipt without any reference to the copy of this document that Defendant provided to Detective Donges or Deputy St. Onge.

Finally, I determine that Defendant's business license is a public document that Agent Masters inevitably would have obtained through a search of government records based on leads that he or the VCSD had previously developed independently without reference to Defendant's communications with Detective Donges and/or Deputy St. Onge. Indeed, the license itself states that it is to be posted "in a conspicuous place," and I therefore question whether Defendant has any reasonable expectation of privacy with respect to this document. For these reasons, the Government has identified independent sources for the key documents in this case which are not subject to the exclusionary rule, and thus the Government may avoid the impact of this rule by relying on these independent sources in lieu of the versions of the documents that Defendant produced, adopted, or signed during his communications with Detective Donges and Deputy St. Onge.

### E.       Defendant's Testimony During the Suppression Hearing

Finally, the Court briefly addresses whether or under what circumstances the Government may use Defendant's testimony at the suppression hearing in order to incriminate or impeach him at trial. The need to address this issue is prompted by the prosecutor's repeated efforts at the suppression hearing to cross examine the Defendant on issues which have no bearing on his motions to suppress and instead relate to the essential elements of the Government's case-in-chief at trial.

Such efforts are contrary to Fed. R. Evid. 104(d), which expressly provides that: "The accused does not, by testifying upon a preliminary matter, become subject to cross-examination as to other issues in the case." In addition, the Supreme Court has found it

"intolerable that one constitutional right should have to be surrendered in order to assert another" in this context.  Simmons v. United States, 390 U.S. 377, 394 (1968).  Thus, when a defendant tenders his own testimony in order to establish the grounds for invoking his constitutional rights a suppression hearing, the prosecution cannot later use that testimony over the defendant's objection for purposes of establishing his guilt during the prosecution's case-in-chief at trial.  See id.

There are limited exceptions to this general rule.  See generally United States v. Salvucci, 448 U.S. 83, 93-94 & nn. 7, 8 (1980) (leaving open the question whether a defendant's testimony at a suppression hearing could be used for impeachment purposes at trial, and acknowledging that such testimony could "provide the prosecutor with information advantageous to the preparation of [the government's] case and trial strategy"); see, e.g., United States v. Jaswal, 47 F.3d 539, 543 (2nd Cir. 1995) (allowing use of a defendant's prior inconsistent testimony at a suppression hearing for impeachment purposes during cross-examination of that defendant at trial).  But cf. Portash, 440 U.S. at 458-59 (concluding that compelled or involuntary statements cannot be used for impeachment purposes at trial).  To the extent that the Government seeks to invoke such an exception in this case, the Court will require the Government's counsel to provide advance notice of its intent to do so and brief the issue by no later than the deadline for filing motions in limine (*i.e.*, ten working days before trial).

F.      **Defendant's Discovery Motions**

In addition to the suppression motions discussed above, Defendant has filed two discovery motions invoking Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.  In the first discovery motion, Defendant requests (1) internal police files or employment records affecting the credibility of Detective Donald Donges, Sergeant Simon Martinez, and Deputy Jim Martinez pursuant to Giglio v. United States, 405 U.S. 150 (1972), (2) any agreements that police entered into with other fugitive recovery agents involved in the January 14 incident to obtain their testimony in this case, and (3) information about the prior convictions of other individuals involved in that incident.  In the second discovery motion, Defendant requests (4) recordings of the 911 call placed by Defendant and another fugitive recovery agent during the first phase of the January 14 incident, (5) copies of the activity log or "CAD" for the deputies who responded to the 911 call, and (6) a copy of the statement obtained from Defendant and digitally recorded on February 13, 2007 (the date when the search warrant was executed).

In its written responses to these motions, the Government represents that it has produced the digitally recorded statement to Defendant on May 4, 2007, as well as the complete report provided by VCSD to ATF Agent Masters, including the CAD report (which is more in the nature of a summary or printout from a system that Detective Donges described as unreliable).  [Doc. 27-2.]  The Government represents that the VCSD did not retain any recordings of the 911 call(s) at issue here, and the procedure for obtaining such recordings from a third party (Onstar) is the subject of a separate motion and ruling.  [Doc.

-36-

37.] The Giglio material pertaining to Detective Donges also is the subject of a separate, *Sealed Order* [Doc. 34] and was addressed on the record at the suppression hearing at which Detective Donges testified. Thus, it appears that Defendant's discovery motions are moot with respect to items (4), (5), (6), and the main witness referenced in item (1).

As for the remainder of the information requested in items (1), (2), and (3), the Court was unable to get a clear answer from the Government's counsel at the suppression hearing because none of the listed persons (except for Detective Donges) testified on that occasion, and the Government had not yet decided which witnesses it would call at trial. The Court therefore directed the parties to further confer regarding these items when the Government identifies its trial witnesses.

The Court's ruling as to the inadmissibility of Defendant's communications with Detective Donges and Deputy St. Onge may cause the Government to reconsider which witnesses it must call at trial in order to meet the essential elements of its case. Insofar as the Government cannot build its case-in-chief on Defendant's testimony at the suppression hearing or his admissions to Detective Donges or Deputy St. Ange, other witnesses who were actually present at the time of the January 14 incident are likely to take on greater importance.

To the extent that the Government intends to call any of the persons listed in Defendant's discovery motions at trial (*i.e.*, Sergeant Simon Martinez, Deputy Jim Martinez, the other fugitive recovery agents identified in the police reports, or the other occupants of the 17 Fermin Chavez Road residence identified in the police reports), the Court will require

-37-

the Government to produce the requested categories of information for those witnesses if such information exists.  To the extent that the parties dispute whether a particular item pertaining to one or more of these witnesses does or does not fall under the category of <u>Brady</u> or <u>Giglio</u> material, the parties may request that the Court make this determination after reviewing the item *in camera* and under seal.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the issues raised in Defendant's motions do not provide a basis for invoking the exclusionary rule with respect to the shotgun, ammunition, firearm sales receipt, business license, unsigned written statement attributed to Defendant's email address, or any other evidence seized from the 7205 Cardiff Ave. address or obtained from other independent sources.  The Court will, however, suppress Defendant's communications with Detective Donges and Deputy St. Onge of the VCSD, and order the Government to provide additional discovery material regarding government's trial witnesses.

The Court also reminds counsel that this *Memorandum Opinion and Order* is limited to addressing Defendant's arguments for invoking the exclusionary rule on constitutional grounds.  The parties are not foreclosed from seeking to exclude additional evidence (such as that concerning the January 15th incident) on alternative grounds provided in the Federal Rules of Evidence or the Confrontation Clause of the Sixth Amendment.  To the extent that they can be anticipated before trial, counsel are directed to raise such alternative grounds for the exclusion of evidence by means of motions in limine filed no later than ten (10) working days before trial.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion to Suppress* [Doc. 13] filed on June 12, 2007, and amended [Doc. 17] on June 13, 2007, is **DENIED**.

**IT IS FURTHER ORDERED** that *Defendant's Motion to Suppress Statements and Evidence Derived Therefrom* [Doc. 14] is **GRANTED IN PART** and **DENIED IN PART** under the conditions specified above.

**IT IS FURTHER ORDERED** that *Defendant's Motion for Impeachment and Exculpatory Evidence Pursuant to Giglio v. United States* [Doc. 15] is **GRANTED IN PART** and **DENIED IN PART** under the conditions specified above.

**IT IS FURTHER ORDERED** that *Defendant's Motion for Additional Discovery Pursuant to Brady v. Maryland* [Doc. 16] filed on June 12, 2007, is **GRANTED IN PART** and **DENIED IN PART** under the conditions specified above.

**SO ORDERED** this 18th day of October, 2007, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge