IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.                                 No. CR 07-697 MCA

ALFRED R. TAFOYA,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant's Motion to Dismiss for Violation of Double Jeopardy Clause* [Doc. 146] filed on March 29, 2008.  The Court held a hearing on the above motion on April 30, 2008.  Having reviewed the parties' submissions, the relevant law, the arguments and explanations of counsel presented at the hearing, and being otherwise fully advised in the premises, the Court denies Defendant's motion for the reasons set forth below, and for the reasons set forth on the record at the hearing.

## I.   BACKGROUND

The criminal charges at issue in this case initially arose from the efforts of fugitive recovery agents (commonly referred to as "bounty hunters") to apprehend a fugitive weighing 350 pounds from a residence in Valencia County, New Mexico.  These criminal charges have been the subject of numerous pretrial proceedings and controversies which culminated in the Court's declaration of a mistrial on February 20, 2008.

A.    **Pretrial Proceedings**

On April 10, 2007, Defendant Alfred R. Tafoya was indicted on a single count of being a felon in possession of a firearm on or about January 14, 2007.  On or about June 12, 2007, Defendant filed a series of motions to suppress evidence and to obtain discovery. [Doc. 13, 14, 15, 16, 17.]   The Court held a hearing on those motions on August 20, 2007 [Doc. 36], and issued a *Memorandum Opinion and Order* [Doc. 43] on October 18, 2007. In that ruling, the Court found that the testimony of the Government's main witness at the suppression hearing, Detective Donges of the Valencia County Sheriff's Department, was not credible.   The Court also granted Defendant's motion to suppress the content of Defendant's communications with Detectives Donges and another Valencia County Sheriff's Detective on the grounds that Defendant's communications with those officers were not knowingly and voluntarily made.

On December 5, 2007, the Government obtained a *Superseding Indictment* [Doc. 54] which extended the date of the crime charged in Count 1 to include January 15, 2007, and added a second charge of being a felon in possession of body armor on or about February 13th, 2007.  On the latter date, government agents executed a search warrant at a residence shared by Defendant and his family, where they allegedly found both the body armor and the firearm that Defendant is accused of possessing during the earlier incidents.

Defendant responded to the *Superseding Indictment* by, among other things, filing a *Motion for Severance of Counts* [Doc. 55], which the Court granted in an unopposed *Order* [Doc. 90] filed on January 2, 2008.  As a result, the Court commenced a trial on the firearm

charge (Count 1) on February 19, 2008, and the trial on the body-armor charge (Count 2) is to occur separately at a later date.

### The January 14th Incident

The firearm charge alleged in Count 1 of the original *Indictment* arose from an altercation at 17 Fermin Chavez Road in Valencia County, New Mexico, that occurred late in the evening of January 14, 2007, when Defendant allegedly fired a shotgun in the course of rescuing another fugitive recovery agent, Susan Lopez, while the two of them were retreating from a failed attempt to apprehend a fugitive, Darlene Eller.  Defendant and Ms. Lopez allegedly went to that address with the expectation that Ms. Eller was going to "self-surrender" and turn herself in to Ms. Lopez without a struggle.  Expecting a peaceful self-surrender, Defendant and Susan Lopez agreed that Ms. Lopez would enter the residence and Defendant would remain outside.  It turned out, however, that Ms. Eller--who was described as weighing 350 pounds and standing about five feet eleven inches tall--actively resisted Ms. Lopez's efforts to apprehend her on that occasion and elicited help from several other residents of 17 Fermin Chavez Road to repel Ms. Lopez and Defendant.

The evidence developed at trial from Witness Susan Lopez was that she was physically assaulted and battered by the numerous occupants of the residence.  That she sustained serious injuries to her head and body was uncontroverted.

Ms. Lopez called for assistance during the attack.  In response, Defendant allegedly retrieved a shotgun in his effort to stop the beating of Ms. Lopez and fired a round as they attempted to retreat from the property.  An ambulance subsequently transported Ms. Lopez

to an area hospital. Susan Lopez and her spouse, Robert Walker, each testified that Defendant's actions saved Ms. Lopez's life. Defendant has asserted that his possession of a firearm during the January 14th incident was justified by the defense of necessity.

### The January 15th Incident

During the early morning hours of January 15th, Mr. Walker received information that Ms. Eller was back at the residence, and he requested that Defendant accompany him, along with another fugitive recovery agent, back to the residence to apprehend Ms. Eller. In the *Superseding Indictment* and in subsequent briefing and hearings on pretrial motions, the Government clarified that Defendant's allegedly unlawful possession of a firearm also encompassed this second incident during the early morning hours of January 15th, when Defendant allegedly returned to the same residence with other fugitive recovery agents (including Witness Robert Walker) in a second effort to apprehend Ms. Eller. The January 15th incident allegedly gave rise to another violent struggle between the fugitive recovery agents and the residents.

Defendant is the only alleged participant in the violent struggles at 17 Fermin Chavez Road who is charged with any crime arising from those struggles, and the only crime with which he is charged in relation to the incidents at that address is the crime of being a felon in possession of a firearm. Nevertheless, the fact that numerous individuals other than Defendant were alleged to have participated in the violent struggles at that location raised concerns in my mind about whether these individuals would need to be counseled about their Fifth Amendment privilege against self-incrimination in the event that they were called as

witnesses in this case.  Accordingly, the Court held hearings on this issue and appointed counsel for the alleged participants who were named by the parties as witnesses.  After certain witnesses received the advice of appointed counsel concerning their Fifth Amendment privilege, the Government decided not to call some of them and granted immunity to others who had invoked that privilege.

Meanwhile, Defendant filed and briefed a *Motion in Limine to Exclude Evidence of January 15, 2007 Incident* [Doc. 57] on the grounds that such evidence would be irrelevant because no one had alleged that Defendant possessed a shotgun or ammunition on that occasion.  In response to this motion, the Government proffered one witness, Robert Walker, who is alleged to have observed Defendant in possession of a shotgun during the January 15th incident.  Mr. Walker is one of the witnesses who invoked his Fifth Amendment privilege on the advice of counsel and was then granted immunity by the Government.

In the *Memorandum Opinion and Order* [Doc. 124] filed on February 11, 2008, the Court accepted the Government's proffer regarding Mr. Walker's proposed testimony about his observation of Defendant in possession of a firearm during the January 15th incident, and the Court found that such testimony would be directly relevant to prove the essential elements of the firearm charge alleged in Count 1 of the *Superseding Indictment*.  The Court further found that Mr. Walker's proffered testimony regarding the alleged observation of a shotgun during the January 15th incident would be inextricably intertwined, to some degree, with a limited amount of background evidence necessary to place the events of that date in context and give the jury a sense of the perspective from which Mr. Walker made his

observations.  Accordingly, the Court allowed Mr. Walker to testify at trial about his observation of Defendant possessing a shotgun during that incident and to provide a limited amount of background information necessary to place these observations in context.

The Court also found, however, that there would be a great danger of unfair prejudice if the Government were permitted to use Mr. Walker's proffered testimony concerning Defendant's alleged possession of a shotgun on January 15, 2007, as a springboard for the admission of further evidence concerning every other bad act the Defendant might have committed during the struggle with the residents of 17 Fermin Chavez Road on or about that date.  In this regard, the Court noted the Government's failure to show any specific nexus between the permissible purposes for admitting evidence under Rule 404(b) and the other events of January 15th (such as the fugitive recovery agents' alleged forcible entry into the residence and their alleged forcible detention of its occupants).  Lacking such a specific nexus, the Court noted the likelihood that evidence concerning these other events would cause jurors to draw the kind of "propensity inference" of bad character or criminal disposition that Fed. R. Evid. 403 and 404 prohibits.  See United States v. Moran, 503 F.3d 1135, 1145 (10th Cir. 2007).

The Court further noted that if the evidence regarding the January 15th incident was not limited so as to avoid such propensity inferences, then other witnesses were likely to make accusations unrelated to the charge at issue in this case which cast Defendant in an extremely negative light.  Presenting such unrelated accusations at trial is unfairly prejudicial and confusing to the jury because it invites a mini-trial on whether Defendant and his fugitive

recovery partners forcibly entered the 17 Fermin Chavez Road residence and, if they did, whether they were justified in doing so in order to take the fugitive into custody.  Such a mini-trial would in turn invite the jury to become preoccupied with accusations unrelated to the shotgun and convict Defendant based solely on evidence of aggressive conduct or malicious intent toward the residents of 17 Fermin Chavez Road on that occasion.

In order to avoid such likelihood of unfair prejudice, confusion of the issues, and other considerations listed in Fed. R. Evid. 403 and 404, the Court's *Memorandum Opinion and Order* [Doc. 124] placed a number of very specific limitations on the admission of evidence at trial concerning the January 15th incident.  In addition to the limitations on the testimony of Witness Robert Walker noted above, the Court offered to provide a limiting instruction that was designed to explain to the jury the limited purposes for which they were to consider the evidence concerning the January 15th incident.  The parties agreed on this limiting instruction, but Defendant's counsel asked the Court to defer reading it to the jury until later in the trial.  [Tr. 2-20-08, at 129.]

The Court's *Memorandum Opinion and Order* [Doc. 124] also instructed counsel that after Mr. Walker's trial testimony was completed, the Government would be given a limited opportunity to elicit testimony from other witnesses concerning the January 15th incident during its case-in-chief, "*but only as necessary to clarify specific matters raised during Mr. Walker's testimony as it relates to Defendant's alleged possession of the shotgun, i.e., whether they also observed Defendant possessing the shotgun, or whether they observed Mr. Walker in a position from which he could have seen what the Defendant was doing during*

*the incident*." [Doc. 124, at 9.]  The Court directed counsel for the Government to alert the Court outside the jury's presence "*before proceeding any further, in order to allow for a timely objection by opposing counsel and an informed ruling by the Court.*"  [Doc. 124, at 9.]  In this regard, the Court specifically advised that:  "*Should there b[e] any doubt in counsel's mind as to whether or under what circumstances a particular question is permitted by the Court's pretrial rulings, they are directed to bring the matter to my attention outside the jury's presence before asking that question.*"  [Doc. 124, at 10.]

The Court reminded counsel of these pretrial rulings at the beginning of the trial.  In particular, I reminded counsel of "*the strict limitations that the Court put on any references to any of the extraneous conduct that occurred at the residence on the 15th.  We did try to fashion . . . some reasonable parameters to put the matter in context but you have to understand the only concern on the 15th is the possession of the firearm, and this is not going to turn into a trial of evidence of fights and break-ins and everything else.  That is highly prejudicial.  So I would remind the Government . . . of its obligation based on the contours that the Court has set previously.*"  [Tr. 2-19-08.]

### B.    The Trial Testimony of Ms. Lopez and Mr. Walker

At trial, the Government first called Witness Susan Lopez to testify about the January 14th incident and an earlier incident referenced in the Court's pretrial ruling [Doc. 120] on the Government's *Notice of Intent to Use Evidence Pursuant to Rules 404(b) of the Federal Rules of Evidence* [Doc. 64].  The Government then called Witness Robert Walker, who testified about whether or to what extent he observed Defendant possessing a shotgun during

the January 15th incident.  Ms. Lopez was present during the January 14th incident; Mr. Walker was not.  Mr. Walker was present during the January 15th incident; Ms. Lopez was not.  Both Mr. Walker and Ms. Lopez testified under grants of immunity from the Government.

During cross-examination, Defendant's counsel elicited testimony which, among other things, called into question Mr. Walker's memory of the January 15th incident.  During cross-examination of Ms. Lopez, her memory of some of the events of January 14th also was called into question because of her testimony that she suffered memory loss due to the head injuries she sustained in that incident.  Thus, both Mr. Walker and Ms. Lopez testified that they had some difficulty remembering certain details concerning the incidents or their prior statements, and such testimony may have weakened the Government's case as to whether Defendant possessed the shotgun on other occasions besides the January 14th incident.  [Tr. 2-20-08, at 54-55, 82, 86, 100-01, 109-11, 125.]

With respect to the January 14th incident, however, both witnesses agreed that Defendant's actions had saved Ms. Lopez's life.  [Tr. 2-20-08, at 50-51, 111-12.]  More specifically, Ms. Lopez's testimony indicates that she was severely beaten and overpowered by the residents of 17 Fermin Chavez Road during that incident, and that she felt they would have killed her but for the intervention of Defendant, who himself might have been overpowered and killed but for his possession and use of the shotgun to repel the attackers.  [Tr. 2-20-08, at 17-21, 45-51.]

The testimony of Ms. Lopez and Mr. Walker on this point is significant because Defendant has argued that his momentary possession of the shotgun during the January 14th incident was legally justified by the necessity defense that the Tenth Circuit recognized in United States v. Al-Rekabi, 454 F.3d 1113, 1121-22 (10th Cir. 2006).  [Doc. 120.]  The trial testimony of Mr. Walker and Ms. Lopez to the effect that Defendant saved Ms. Lopez's life during the January 14th incident may have aided this defense.  Viewed in the light most favorable to Defendant, the testimony of Ms. Lopez and Mr. Walker also could suggest a grave injustice:  the Government is charging Defendant with illegally possessing a shotgun when he used it to save the life of an unarmed woman while she was being beaten by a gang of people who were about to kill her, but none of the people who actually inflicted that beating are charged with any crime relating to that incident.

### C.   **The Motion for Mistrial**

The Government's third witness at trial was Sergeant Simon Martinez, a deputy with the Valencia County Sheriff's Department.  Initially, the Government elicited testimony from Sergeant Martinez about his actions and observations in responding to the scene of the January 14th incident after Defendant and Ms. Lopez had retreated from the residence.  Then, without any attempt to alert the Court outside the jury's presence, counsel for the Government proceeded to elicit testimony from Sergeant Martinez about the January 15th incident by asking the following open-ended question:  "*What happened after that?*"  [Tr. 2-20-08, at 138.]  The witness immediately responded:  "*Probably a good 45 minutes later, dispatch dispatched us back out there and advised us that **the bondsmen were back and that***

*this time they were battering some of the residents.*"[1]  [Tr. 2-20-08, at 138 (emphasis added).]

Due to the open-ended phrasing of the question and the immediacy of the witness' response, the Court had no opportunity to foresee that the Government was changing the subject to the January 15th incident.  Immediately after the witness responded, however, Defendant's counsel asked to approach the bench and moved for a mistrial.  The Court then conducted a bench conference and excused the jury from the courtroom so as to allow the parties to argue the motion outside the jury's presence.

Counsel for the Government responded to Defendant's motion for a mistrial by asserting that any error in Sergeant Martinez's response could be cured by providing the jury with the limiting instruction that the Court had previously offered in its ruling on the Defendant's motion in limine regarding the January 15th incident.  Counsel for the Government further contended that Sergeant Martinez's response was unlikely to cause unfair prejudice because it did not specifically mention the Defendant by name.

The Court was unpersuaded by this argument because the jury had already heard that Ms. Lopez and Defendant were the only bondsmen or fugitive recovery agents present during the January 14th incident and that Ms. Lopez was taken from the residence via ambulance.  Thus, the only person the jury could have reasonably inferred to be "back" at the residence was Defendant.

_____

[1]In the context presented here, fugitive recovery agents are sometimes referred to as "bondsmen."  Mr. Walker testified that "bondsmen" are associated with, and can also work as, fugitive recovery agents.  [Tr. 2-20-08, at 69-70.]

-11-

After hearing from counsel for both parties, I rejected the Government's contentions and stated that I would grant the Defendant's motion for a mistrial. My reasons for granting the mistrial are stated in more detail in the *Memorandum Opinion and Order* [Doc. 136] filed on February 22, 2008, which I incorporate into my present ruling.

Following the mistrial, I held a status conference on March 13, 2008, at which Defendant's counsel stated her intention to file a motion to dismiss Count 1 on double-jeopardy grounds.  [Doc. 138.]  The trial on Count 1 was reset for April 7, 2008, but then subsequently vacated due to the need for a hearing on Defendant's motion to dismiss in advance of the trial date.  The motion to dismiss was heard on April 30, 2008.

At that hearing, I gave the parties an opportunity to identify any witnesses that they wished to call and to describe the areas of inquiry they wished to pursue with respect to each witness.  The only witnesses identified by the parties were the prosecutor, Mr. Armijo, and the Defendant's counsel, Ms. Johnson.  The Government sought to call Ms. Johnson as a witness in order to compel her to explain why she moved for a mistrial.  I determined this request to be inappropriate under the circumstances.  I determined that the prosecutor, Mr. Armijo, would not initially be sworn as a witness, but rather would be asked informally to explain the circumstances of his questioning of Sergeant Martinez.

I then gave Mr. Armijo the opportunity to explain his conduct and respond to inquiries in his capacity as an officer of the Court, without requiring him to take the witness stand and provide sworn testimony.  Mr. Armijo candidly admitted at the hearing that he was mistaken or ill-prepared in asking the question which prompted the testimony that led to the mistrial,

but he denied that he asked that question, or engaged in any other conduct, with the intent

to goad the Defendant into moving for a mistrial.  Mr. Armijo also admitted that he had not

properly prepared Sergeant Martinez as a witness, and he did not review the Court's

evidentiary rulings concerning the January 15th incident with this witness prior to trial.

According to Mr. Armijo, this case represented his first criminal trial in federal court.

## II.   <u>ANALYSIS</u>

Defendant contends that Mr. Armijo's explanation of his conduct at trial is not

credible and that Count 1 of  the *Superseding Indictment* must be dismissed on double

jeopardy grounds.  The Double Jeopardy Clause of the Fifth Amendment to the United States

Constitution generally prohibits a prosecutor from trying the same person twice for the same

crime.  <u>See</u> <u>Oregon v. Kennedy</u>, 456 U.S. 667, 671 (1982).  For purposes of this prohibition,

jeopardy attaches when a jury is sworn.  <u>See</u> <u>United States v. Lindsey</u>, 389 F.3d 1334, 1336-

37 (10th Cir. 2004).  At that point, "the Double Jeopardy Clause affords a criminal defendant

a 'valued right to have his trial completed by a particular tribunal.'"  <u>Kennedy</u>, 456 U.S. at

671-72 (quoting <u>Wade v. Hunter</u>, 336 U.S. 684, 689 (1949)).  Thus, after a jury is sworn, the

prosecutor cannot unilaterally elect to terminate the trial proceedings before a verdict is

reached merely because he or she believes the trial is going poorly for the Government and

does not want to take the risk that the proceedings will result in an acquittal.

When a defendant moves the Court to terminate the trial before the jury reaches a

verdict, a different rule applies.  A mistrial granted at a defendant's request generally does

not preclude the prosecutor from retrying the case a second time before a different jury, <u>see</u>

id. at 672-73, because "[a] defendant's motion for a mistrial [usually] constitutes 'a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact,'" id. at 676 (quoting United States v. Scott, 437 U.S. 82, 93 (1978)).

There is a "narrow exception" to this rule "where the prosecutor's actions giving rise to the motion for mistrial were done 'in order to goad the [defendant] into requesting a mistrial.'"  Id. at 673 (quoting United States v. Dinitz, 424 U.S. 600, 611 (1976)).  In that instance, it does not matter that the defendant was the one who requested the mistrial, because the prosecutor's deliberate provocation remains the cause of the request.

Courts have sometimes encountered difficulty in defining the scope of this exception because, in many instances, a prosecutor's actions or misconduct may *cause* a mistrial even though the prosecutor did not *intend* to cause a mistrial.  Defining the exception in terms of "bad-faith conduct" or "overreaching" by the prosecutor, or in terms of "harassment" or "prejudice" to the defendant, have proven to be unworkable, in part because they fail to recognize this distinction between general causation and specific intent.  See United States v. Gonzalez, 248 F.3d 1201, 1204-05 (10th Cir. 2001).  Insofar as the Defendant in the present case seeks to revive these earlier formulations of the test for determining whether the Double Jeopardy Clause forbids a retrial in this context, I reject them because they do not accord with the Supreme Court's more recent analysis in Kennedy and the Tenth Circuit's reasoning in Gonzalez.

Kennedy and Gonzalez clarified that the Double Jeopardy Clause forbids the retrial of a criminal defendant who has successfully requested a mistrial only when the prosecutor's conduct was *intended* to "provoke" or "goad" the defendant into making that request, or to otherwise "subvert the protections afforded by the Double Jeopardy Clause." Kennedy, 456 U.S. at 675-76; accord Gonzalez, 248 F.3d at 1204. In other words, "the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." Kennedy, 456 U.S. at 678.

The Kennedy Court further clarified that this standard "merely calls for the court to make a finding of fact" by "[i]nferring the existence or nonexistence of intent from objective facts and circumstances" of the particular case. Id. at 675. In some instances, it may be necessary for the trial court to hold an evidentiary hearing in order to obtain a sufficiently developed record in support of its findings. See, e.g., United States v. Oseni, 996 F.2d 186, 189 (7th Cir. 1993). More frequently, however, courts find that no evidentiary hearing is necessary because they are familiar with the record made during the previous trial and have no residual doubts about the prosecutor's explanation for his or her conduct. See, e.g., United States v. Gilmore, 454 F.3d 725, 730 (7th Cir. 2006); United States v. Hagege, 437 F.3d 943, 952-53 (9th Cir. 2006); United States v. Curry, 328 F.3d 970, 974 (8th Cir. 2003); United States v. White, 914 F.2d 747, 752 n.1 (6th Cir. 1990).

In order to determine whether an evidentiary hearing was necessary in the circumstances presented here, I used the approach articulated by the Circuit Courts in the cases cited above.  Under this approach, I "first, elicit an informal explanation from the prosecutor as to the reason for the misconduct, and, second, assess the progress of the trial." Hagege, 437 F.3d at 952.  The additional step of holding a formal evidentiary hearing, at which witnesses are called to the stand to give sworn testimony, is "necessary only if there existed a genuine issue in the mind of the trial court concerning the prosecutor's intent" after hearing his informal explanation.  White, 914 F.2d at 752-53 n.1.  In other words,  "the evidentiary hearing serves as a backstop for the district judge if she is not, or a reasonable judge would not be, satisfied with the prosecutor's explanation." Gilmore, 454 F.3d at 730.

If, after following the procedure outlined above, the Court denies a motion to dismiss on double-jeopardy grounds, then such a ruling is immediately appealable under the "collateral order" doctrine, absent a finding that the appeal would be frivolous because there is no colorable claim to double jeopardy.  See Abney v. United States, 431 U.S. 651, 659-663 (1977).  Accordingly, trial courts are asked to make written findings on the issue of whether a motion to dismiss on double-jeopardy grounds is frivolous or non-frivolous whenever they deny such a motion.  See Curry, 328 F.3d at 972.

In this case, I find that the Defendant's double-jeopardy claim is colorable and not frivolous.  "'A colorable claim requires a showing of previous jeopardy and the threat of repeated jeopardy.'"  Id. at 972 (quoting United States v. Abboud, 273 F.3d 763, 766 (8th Cir. 2001)).  It is beyond dispute that a jury was sworn on February 19, 2008, and that

jeopardy therefore attached as to the crime charged in Count 1 of the *Superseding Indictment*. I also find that the prosecution and previous trial on Count 1 of the *Superseding Indictment* gave rise to some objective facts and circumstances which, when viewed in the light most favorable to the Defendant, conceivably could have provided a prosecutor with a motive to provoke a mistrial.

In particular, I note that the Government suffered a number of setbacks in its effort to prosecute the Defendant for the firearms charge in Count 1 of the *Superseding Indictment*. For example, the Court suppressed certain statements and evidence obtained from the Defendant, and the Government was required to disclose certain materials relevant to the impeachment of some of its law-enforcement witnesses pursuant to Giglio v. United States, 405 U.S. 150 (1972). Other government witnesses elected to invoke their Fifth Amendment privilege and decline to testify, thus prompting the Government to grant them immunity, and thus possibly raising additional impeachment evidence for the defense. Even when granted immunity, two of the Government's most important witnesses with respect to the incidents that gave rise to the firearm charge in Count 1 of the *Superseding Indictment* had difficulty remembering some of the events in question and gave testimony that could be construed as inconsistent with their prior statements or otherwise helpful to the defense.

Nevertheless, there are other facts and circumstances concerning the progress of the trial which support the conclusion that none of the attorneys involved in prosecuting this case ever intended to subvert the protections afforded by the Double Jeopardy Clause by provoking the Defendant's motion for a mistrial. Despite the setbacks that the Government

may have faced from the Court's pretrial rulings and from impeachment evidence or other weaknesses concerning its witnesses, I find the prosecutors had a good-faith belief that they still had enough evidence to overcome Defendant's necessity defense and obtain a conviction on Count 1.

Although Mr. Armijo was questioning the witness at the time Defendant's counsel moved for a mistrial, another Assistant United States Attorney, Mr. Valencia, was seated at counsel table in a supervisory capacity throughout most of the trial. At the hearing on April 30, 2008, Mr. Valencia articulated a plausible view of the trial testimony which, if credited by a jury, might have led to a conviction on Count 1. In support of this view, I also take into consideration that the mistrial was declared during direct examination of the Government's third witness. At that point, the Government had additional witnesses whom the prosecutors had not yet called, and thus they were not facing a situation where they were going to immediately face a motion for judgment of acquittal at the end of Sergeant Martinez's testimony. Insofar as the prosecutors had a well-founded, good-faith belief that they could still muster enough evidence at trial to sustain a conviction on Count 1, and that they had plenty of time to do so before resting their case-in-chief, I find they had no specific motive to engage in any misconduct that would provoke a motion for a mistrial.

I also find that, under the circumstances presented here, Mr. Armijo's explanation does not support a reasonable inference that he formulated a plan for eliciting improper testimony from Sergeant Martinez with the intent to violate the Court's pretrial rulings and thereby prompt a motion for mistrial. In this regard, I have no doubt that Mr. Armijo was

candid and truthful in explaining the mistakes which led him to ask the question which prompted the mistrial, and that these mistakes were never intended to provoke or goad the Defendant into moving for a mistrial.  Accordingly, I determined that a formal evidentiary hearing was not necessary at this juncture.  The explanations offered by counsel as an officer of the Court, in combination with the existing record of the proceedings in this case (with which the Court was and is familiar), are sufficient to support the findings set forth in this *Memorandum Opinion and Order*.

At the hearing on April 30, 2008, Mr. Armijo credibly explained that he did not know how the witness was going to respond to his open-ended question about "what happened after that?"  His explanation further indicates that Mr. Armijo's trial preparation with Sergeant Martinez was less than thorough.  I again note that this was Mr. Armijo's first criminal trial in federal court after having spent a considerable amount of time working in an administrative or executive capacity outside the courtroom.

I further note that, until corrected by the Court at the hearing on April 30, 2008, it appeared that Mr. Armijo did not fully understand or appreciate that the testimony he elicited from Sergeant Martinez, as well as the manner in which he elicited it, was a violation of the Court's pretrial rulings and, as such, provided a basis for granting a mistrial.  This lack of understanding is also evidenced by the Government's written response to Defendant's motion to dismiss, which quotes passages from the Court's prior *Memorandum Opinion and Order* [Doc. 124] out of context and maintains that the Government did not violate the terms of that ruling, despite the Court having found such a violation at the time the mistrial was

granted.  Under these circumstances, I find it implausible that Mr. Armijo formulated or carried out a plan to knowingly violate the Court's pretrial rulings, and thereby provoke a mistrial, through his direct examination of Sergeant Martinez.

Such intent also is inconsistent with the position that the prosecutors took in opposition to Defendant's motion for a mistrial, in which they suggested or agreed to other alternatives, such as a limiting instruction, for addressing the unfair prejudice created by Sergeant Martinez's improper testimony.  The prosecutors' specific actions in opposing Defendant's motion for a mistrial instead suggest that they fully intended to proceed with the trial.

Similarly, the prosecutor's actions before trial are not consistent with an intent to provoke a motion for a mistrial.  I note, for example, that the prosecutors elected not to file a timely interlocutory appeal of any of my pretrial rulings that were adverse to the Government in the hope of delaying the trial.  Rather, the prosecutors repeatedly indicated their willingness and intent to take this case to trial without such delays, as well as their belief that there remained enough evidence to support a conviction notwithstanding any limitations imposed by the Court's pretrial rulings.

For these reasons, I conclude that this case does not fall within the narrow exception under which the retrial of a criminal defendant who has successfully moved for a mistrial is barred by the Double Jeopardy Clause.  Under Kennedy, 456 U.S. at 675-76, and Gonzalez, 248 F.3d at 1204, this exception only applies when a prosecutor *intends* his conduct to

provoke or goad a defendant into moving for a mistrial. I find that none of the attorneys involved in prosecuting this case had such a specific intent here.

My findings and conclusions on this point do not exonerate the Government with respect to all allegations of wrongdoing in this case. The question presented by Defendant's motion to dismiss is limited to whether the Government engaged in a specific form of prosecutorial misconduct which is so egregious as to warrant the ultimate sanction of dismissing Count 1 of the *Superseding Indictment* with prejudice. The Court still may consider other remedies short of dismissal to remedy the admitted shortcomings in the Government's ability to handle its witnesses and to comply with the Court's pretrial rulings.

In order to prevent a recurrence of similar errors during a retrial in this case, I shall require counsel to seek clarification from the Court outside the jury's presence if they have any doubts about their understanding of the Court's pretrial rulings; I also forewarn counsel that further violations of the Court's rulings may result in the imposition of sanctions, including but not limited to the exclusion of particular witnesses or areas of testimony.

The Court recognizes that before this case is retried, the Defendant intends to file an interlocutory appeal of his motion to dismiss on double-jeopardy grounds pursuant to Abney, 431 U.S. at 662. Therefore, assuming a timely appeal is filed, this Court will defer resetting the trial date in this matter pursuant to 18 U.S.C. §§ 3161(e) and (h)(1)(E) until a mandate from the appellate court is received.

### III.  **<u>CONCLUSION</u>**

For the foregoing reasons, the Court finds that the prosecutors in this case did not intend to provoke or goad the Defendant into moving for a mistrial.  It follows that Defendant's motion to dismiss Count 1 of the *Superseding Indictment* on double-jeopardy grounds must be denied.

**IT IS THEREFORE ORDERED** that *Defendant's Motion to Dismiss for Violation of Double Jeopardy Clause* [Doc. 146] is **DENIED**.

**SO ORDERED** in Albuquerque, New Mexico, this 2nd day of May, 2008.

_____
**M. CHRISTINA ARMIJO**
**UNITED STATES DISTRICT JUDGE**